The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner. Neither party here requested the Full Commission to receive further evidence or to rehear the parties or their representatives. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties as
STIPULATIONS
1. A copy of the policies and procedures manual for the Amelia Bauer-Kahn Psychiatric Unit (hereinafter the psychiatric unit) of the Smokey Mountain Center for Mental Health, Mental Retardation and Substance Abuse Services, Angel Community Hospital (hereinafter Angel Hospital), marked as Stipulated Exhibit Number One, is stipulated into evidence.
2. A set of Edward Burton Strickland's medical records from Smokey Mountain, marked as Stipulated Exhibit Number Two, is stipulated into evidence.
3. A set of Mr. Strickland's medical records from Angel Hospital, marked as Stipulated Exhibit Number Three, is stipulated into evidence.
4. A medical expense statement from Murphy Medical Center, marked as Stipulated Exhibit Number Four, is stipulated into evidence.
5. A medical expense statement from St. Joseph's Hospital, marked as Stipulated Exhibit Number Five, is stipulated into evidence.
6. Medical expense statements from Nantahala Radiology Associates, P.A., collectively marked as Stipulated Exhibit Number Six, are stipulated into evidence.
7. A medical expense statement from Dr. Michael B. Rohlfing, M.D., marked as Stipulated Exhibit Number Seven, is stipulated into evidence.
8. A medical expense statement from WNA Anesthesiology Assoc., P.A., marked as Stipulated Exhibit Number Eight, is stipulated into evidence.
9. A set of Mr. Strickland's medical records from the Asheville Hand Center, marked as Stipulated Exhibit Number Nine, is stipulated into evidence.
10. A medical expense statement from the Asheville Hand Center, marked as Stipulated Exhibit Number Ten, is Stipulated into evidence.
11. The undersigned take judicial notice of the 11 March 1991 Order of Commissioner J. Randolph Ward, denying defendant's motion to dismiss under N.C. Gen. Stat. § 1A-1, Rules 12 (b)(1) and 12 (b)(6).
* * * * * * * * * * *
The Full Commission adopt as their own all findings of fact found by the Deputy Commissioner, with minor technical modifications, as follows:
Based upon the competent and convincing evidence adduced at the hearing, the undersigned make the following additional
FINDINGS OF FACT
1. At the time of the incident giving rise to this claim, plaintiff was the wife of Edward Burton Strickland. Mr. Strickland died as the result of an unrelated automobile accident which occurred subsequent to the incident giving rise to this claim. Thereafter, plaintiff qualified as the administratrix of the estate of Edward Burton Strickland.
2. On 29 December 1987, Mr. Strickland was admitted to the psychiatric unit of Angel Hospital in Franklin, North Carolina upon a petition for involuntary commitment filed by plaintiff. In her petition, plaintiff alleged that Mr. Strickland was "mentally ill or a substance abuser who was dangerous to himself or others or mentally ill and in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness." The petition further provided that this allegation was based upon the following facts:
"Told his wife that they would die for Jesus. Has threatened to kill himself. Says he is Christ. One minute he will be hyper and get violent, next minute he will be OK or depressed. Says if he can't get his wife back he will kill himself. Says that some dump trucks were hauling gravel to fill in the graves of his children and that the police were trying to kill him."
3. After being served with plaintiff's petition for involuntary commitment, Mr. Strickland was transported by law enforcement officers to the Angel Hospital Emergency Room to be examined by a physician as required by N.C. Gen. Stat. §122C-263(a).
4. At 11:30 p.m. on 29 December 1987, Mr. Strickland was examined in the Angel Hospital Emergency Room by Dr. K. Gilligan, M.D. Dr. Gilligan, who was not a psychiatrist or a psychologist, found that Mr. Strickland was mentally ill and dangerous to himself. In his written evaluation, Dr. Gilligan found that Mr. Strickland had "been saying things like he [was] `the master' and that he [was] `Hercules'. While being evaluated by Dr. Gilligan, Mr. Strickland appeared lucid and was cooperative. Dr. Gilligan noted that Mr. Strickland had been given or had taken PCP (phencyclidine) the previous week and that he had run naked through a wooded area sustaining scratches on his feet and legs. Mr. Strickland had "healing crusted areas" on both wrists as a result of having struggled in handcuffs while detained in Florida. Based upon his evaluation, Dr. Gilligan recommended that Mr. Strickland be involuntarily committed.
5. Mr. Strickland, accompanied by his mother and grandmother, was then transported to the Angel Hospital's Psychiatric Unit where Ms. P. Young, R.N., conducted an admission assessment of Mr. Strickland. Ms. Young's assessment was based upon her observations of Mr. Strickland, the information contained in the petition for involuntary commitment, Dr. Gilligan's findings, and information related to her by Mr. Strickland and his mother.
6. In her assessment, Ms. Young found that Mr. Strickland was neat and clean in appearance but that he was exhibiting symptoms of depression and anxiety. He was alert, and his mental orientation was normal. He denied having hallucinations, suicidal ideation, or ever having attempted suicide in the past. Mr. Strickland was angered by his status as an involuntary admittee, stating that he wanted to be admitted voluntarily. He further stated that he desired to see a doctor the following day and that he would stay at the hospital if that was the recommendation of the psychiatrists. Mr. Strickland's mother informed Ms. Young that Mr. Strickland had been released from Beach Boulevard Hospital in Jacksonville, Florida the previous Saturday. While hospitalized in Jacksonville, testing was conducted that revealed the presence of large amounts of PCP in Mr. Strickland's system. The findings made by Ms. Young, which were also contained in her nursing notes, accurately reflected Mr. Strickland's behavior and mental condition at the time of his admission to Angel Hospital.
7. After conducting her assessment, Ms. Young telephoned Dr. Karen Hartwell, a board certified psychiatrist, who was the psychiatrist on call during the evening of December 29 and early morning of December 30. Ms. Young related to Dr. Hartwell the allegations set forth in the petition for involuntary commitment, the information given by Mr. Strickland and his mother, as well as the relevant findings she made during her admission assessment.
8. It was the policy of the psychiatric unit of Angel Hospital to assign all admitted patients a rating on the Suicide Intention Rating Scale (hereinafter SIRS rating). SIRS ratings were assigned to patients at the time of admission by the psychiatrist on duty, based upon a review of all patient information available at the time of admission.
9. A SIRS rating of 1 is appropriate for a patient who is not having, and has never had, suicidal thoughts that have been brought to the attention of another person. A SIRS rating of 2 is an appropriate rating for a patient when there is evidence that the patient has attempted suicide in the past and, at the time of assessment, is actively thinking about suicide, or, if the patient is currently having suicidal ideas but is not threatening suicide. A SIRS rating of 3 is appropriate for a patient who has been making serious threats of committing suicide.
10. Dr. Hartwell assigned Mr. Strickland a SIRS rating of 2. From the time of his admission until he was discharged from the psychiatric unit, Mr. Strickland had an SIRS rating of 2.
11. In addition to assigning a SIRS rating, Dr. Hartwell prescribed Mr. Strickland a 2 milligram dose of Activan to relieve his anxiety. At 12:30 a.m., Mr. Strickland reluctantly took the prescribed dosage of Activan. He was then shown to his room where he slept from 1:00 a.m. until 6:15 a.m. when he was awakened so that his vital signs could be checked. During the period between 1:00 a.m. and 6:15 a.m., the nursing staff observed Mr. Strickland at fifteen minute intervals.
12. After his vital signs were checked, the nursing staff summoned Mr. Strickland from his room to the nurses' station where he appeared carrying a bag containing his clothes and asking what time the doctor would come to the hospital. Mr. Strickland declined a request that he return his bag of clothes to his room, stating that he would soon be returning to his home.
13. Thereafter, at some time prior to 10:00 a.m. on 30 December 1987, Mr. Strickland was examined and evaluated by Dr. Hartwell. At the time of Dr. Hartwell's examination, Mr. Strickland's chief complaint was his desire to "get [his] family back." Mr. Strickland was friendly, cooperative and hopeful that the hospital personnel would be able to determine whether he was having emotional problems or suffering from the effects of his PCP ingestion. Although he was mildly depressed, his thought flow was normal, he was not overtly agitated, and his thought content was negative for delusions, hallucinations and homicidal or suicidal ideation.
14. At 10:00 a.m. on 30 December 1987, Mr. Strickland was examined by Dr. Mark Lawrence. Dr. Lawrence found that Mr. Strickland was a substance abuser who was dangerous to himself or others, that he had ingested PCP within the previous week during which time he had been hospitalized in Florida before returning to North Carolina.
15. At the time of his admission, and throughout the duration of his commitment to the psychiatric ward, Mr. Strickland was experiencing PCP induced psychosis. At the time that he was examined by Dr. Lawrence, Dr. Lawrence diagnosed Mr. Strickland as suffering from PCP induced psychosis, although at the time of Dr. Lawrence's examination, Mr. Strickland was not exhibiting any obvious signs of psychosis.
16. At 11:20 a.m., Mr. Strickland was given Activan for increased anxiety and nervousness. Throughout the afternoon, he continued to be concerned about his commitment status, desiring that his status be changed from involuntary to voluntary, and he repeatedly expressed a desire to see his wife and children. Mr. Strickland ate well at breakfast, lunch and dinner.
17. After eating dinner, Mr. Strickland told the nursing staff that he thought the PCP he had ingested was beginning to leave his system. He stated that he was beginning to feel better. Shortly thereafter, he became preoccupied with trying to telephone his wife. At 6:30 p.m. he informed the nursing staff that he was becoming weak and that he felt as if he was going to die.
18. At 6:45 p.m., the nursing staff gave Mr. Strickland a fifty milligram dose of Mellaril to reduce his agitation, as Dr. Lawrence had prescribed previously. He was also given two Tylenol Tablets for his complaints of back pain. On each occasion that Mr. Strickland became agitated, nervous, preoccupied or paranoid, defendant's staff appropriately attended to his needs by offering him their counsel and reassurance and, when necessary, administering medication to relieve his symptoms.
19. After receiving his medication at 6:45 p.m., Mr. Strickland slept on a couch in the patients' social room until approximately 9:30 p.m. At 10:00 p.m., Mr. Strickland was walking along psychiatric unit's hallway asking for change so that he could use the pay telephone. He repeatedly asked the nursing staff if he could use the telephone to call his wife.
20. Immediately before 10:30 p.m., Mr. Strickland was standing in a ward hallway speaking to a member of defendant's nursing staff about the fact that he [Mr. Strickland] was planning to stop smoking cigarettes. Thereafter, he remained in the hallway talking with another patient. At 10:30 p.m., Mr. Strickland ran from the eastern portion of the ward hallway to the western end where he dived through a window, falling three stories to the ground below.
21. As a result of his fall, Mr. Strickland sustained serious bodily injuries.
22. During his commitment, Mr. Strickland was not restrained within the psychiatric ward. During daytime hours, Mr. Strickland was permitted to move freely about all portions of the ward except those restricted to access by defendant's staff. Mr. Strickland was not confined to his room nor was he placed in any physical restraints. However, after 11:00 p.m., Mr. Strickland was expected to be in his bed.
23. Having an SIRS rating of 2, Mr. Strickland was properly permitted to move freely about the psychiatric ward. Any additional restraint, including confinement to his room, physical restraints, or arm's length monitoring or supervision by defendant's staff was contra-indicated in light of Mr. Strickland's PCP induced psychosis.
24. When Mr. Strickland dived through the window he did not intend to harm himself or commit suicide. Rather, he dived through the window because he wanted to go home.
25. The window through which Mr. Strickland dived was approximately thirty-six inches wide with a metal divider in the center. The clear portion of the window was constructed of Plexiglas and was not designed to be opened. Prior to 30 December 1987, the window had withstood the weight of another patient who had attempted to throw herself through it. The window had also withstood other abuse from patients who had thrown objects against it.
26. At all times during his commitment, defendant's psychiatric staff was aware of Mr. Strickland's behavior and whereabouts. Defendant's employees constantly supervised Mr. Strickland's activities during his commitment to the psychiatric unit. The care and treatment provided to Mr. Strickland by defendant's employees was, at all times, reasonable and appropriate.
27. Defendant's employees did not know, and reasonably could not have known, that Mr. Strickland would, without warning, run down the ward hallway, hurl himself through the window, and fall to the ground below. Defendant's employees did not know, and reasonably could not have known, that the window through which Mr. Strickland dived was incapable of withstanding the force of his running charge.
* * * * * * * * * * *
Based upon the findings of fact as found by the Deputy Commissioner and adopted by the Full Commission, the Full Commission find as follows:
CONCLUSIONS OF LAW
1. There was no negligence on the part of any employee, officer, or agent of the State which proximately caused the damages allegedly sustained by plaintiff Sedonna Strickland McCoy. N.C. Gen. Stat. § 143-291, et seq.
2. There was no negligence on the part of any employee, officer, or agent of the State which proximately caused the damages allegedly sustained by the Estate of Edward Burton Strickland. N.C. Gen. Stat. § 143-291, et seq.
3. Neither Sedonna Strickland McCoy nor the Estate of Edward Burton Strickland is entitled to damages. N.C. Gen. Stat. § 143-291, et seq.
* * * * * * * * * * *
Based upon these conclusions of law, the Full Commission have determined there exists no basis for amending the Award. Accordingly, the foregoing stipulations, findings of fact, and conclusions of law engender the following:
ORDER
1. Under the law, the plaintiff's claims must be, and the same are hereby, DENIED.
Each side shall bear its own costs. This case is ORDERED REMOVED from the Full Commission docket.
This the __________ day of ________________________, 1995.
 S/ __________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ ____________ COY M. VANCE COMMISSIONER
S/ ____________ BERNADINE S. BALLANCE COMMISSIONER
JHB/nwm 08/11/95